KENSINGTON WATER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19018. Promulgated May 23, 1929.

*George M. Hosack, Esq.,* and *W. D. McBryar, Esq.,* for the petitioner.

*A. C. Baird, Esq.,* for the respondent.

632

OPINION.

Murdock: The first assignment of error relates to the statement in the deficiency notice that the value of the assets acquired by the petitioner was not in excess of $155,507.07. The petitioner, however, did not introduce evidence to prove the value of the assets at the time they were taken over by it. The second assignment of error alleges that the Commissioner erred in determining that the organization of the petitioner and the taking over of the assets of the Burrell Water Co. was not a corporate reorganization within the meaning of the Revenue Act of 1921. There is nothing contained in the deficiency notice or in the statement attached thereto to show that the Commissioner made any ruling with respect to whether or not the organization of the petitioner and the taking over of the assets of the old company constituted a reorganization under the Revenue Act of 1921. The petitioner laid great stress upon this feature in his brief. It seems to us however that the question is a purely academic one, since, so far as we can see, the decision of it would not affect the deficiency in tax. Counsel for the petitioner made the following statement on the record:

We are starting with the Kensington Water Company for the purpose of determining invested capital and for the purpose of determining the value of

the physical assets, both real and intangible, we are going back to the Burrell Water Company's original holdings.

We do not know what was meant by this statement. Is the petitioner contending that its invested capital should be computed by taking the invested capital to which its predecessor would have been entitled, or does it contend that its invested capital should be computed by using the value of the assets as of the date when they were acquired by the petitioner? In either view of this matter, however, we are left without sufficient data upon which to base an opinion, since the evidence introduced does not show what the invested capital of the Burrell Water Co. would have been for the taxable year in question, or what the value of the tangible or intangible assets was at the time the petitioner acquired such assets.

The evidence is confusing in respect to the consideration paid by the petitioner for the assets previously purchased at the sheriff's sale by R. B. Mellon. The testimony was to the effect that the petitioner paid to T. Mellon & Sons the sum of $155,507.07 for the assets of the old company, and that this money was obtained by floating a new bond issue of $200,000, $160,000 of which was sold. On the other hand, a copy of the certificate of reorganization after the judicial sale introduced in evidence contains the statement set out in our findings of fact. But which state of facts may be the correct one is immaterial, since, if the assets were paid for from funds raised by the bond issue, that would not affect invested capital, or, if, on the other hand, the stock was the consideration for the transfer of the assets, the petitioner has failed to show the value of the assets at the time paid in.

In the third error assigned the petitioner alleges that the Commissioner determined that the petitioner was not entitled to an earned surplus of $64,064.48. This error is apparently related to the fifth error, in one case the amount being designated as earned surplus and in the other as paid-in surplus. The petitioner contends in its brief that it is entitled to an invested capital amounting to $320,008.20. This figure is arrived at by adding to $200,000, the amount of the capital stock, the surplus as shown by the deficiency notice, amounting to $82,585.04, and the "earned or paid-in surplus depreciated," amounting to $37,423.16. We do not know the theory upon which depreciation is figured on surplus, but at least the petitioner claims nothing in excess of $37,423.16. It is not shown how the Commissioner arrived at the surplus of $82,585.04. We can not assume that the figure $82,585.04 did not include all or a part of the earned or paid-in surplus for which the petitioner is contending. We can not, therefore, allow any additional surplus over and above that which the respondent originally allowed.

In the fourth error assigned the petitioner alleged that in computing invested capital the Commissioner disallowed an item of $200,000, representing stock issued by the Burrell Water Co., but it failed to prove what invested capital the predecessor would have been entitled to had there been a continuance of that corporate entity. The petitioner also complains of the elimination from invested capital of the $200,000 designated " franchise account," which will now be considered with the next assignment of error relating to the failure of the Commissioner to find that the capital stock of the petitioner was issued for both tangible and intangible assets. We find nothing in the record to show that the Commissioner ever made any statement with respect to the sort of assets for which the petitioner's stock was issued, except the designation " franchise account capital stock." Suppose the stock were issued for both tangible and intangible assets by the transfer to the petitioner by R. B. Mellon of all the physical assets and franchises of the Burrell Water Co., obtained by him at the sheriff's sale. We do not know the total or the respective values of the tangible and intangible assets when they were taken over on organization, or reorganization, by the petitioner. We know that the old franchises of the Burrell Water Co. were carried on its books at $200,000. No evidence was introduced however to sustain this value as of any date, and in fact the value of the old franchises has never been discussed. In the absence of any corroborative evidence we can not accept this book entry as conclusive of value; *Ledbetter Manufacturing Co.*, 12 B. T. A. 145.

The Revenue Act of 1921 provides in defining invested capital, section 326 (a), that it consists, *inter alia*, of:

(4) Intangible property bona fide paid in for stock or shares prior to March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding on March 3, 1917, whichever is lowest.

We are unable to say what proportion of the petitioner's capital stock was issued for tangibles and what for intangibles, or whether it was issued for cash. The petitioner's assignment of error in respect to this point indicates that the stock of the petitioner was issued without distinction for both tangible and intangible assets. It would be impossible for us to apply the limitation on intangibles contained in section 326 (a) (4) of the Revenue Act of 1921 even if we could find that the stock was issued for assets.

The petitioner introduced two of its balance sheets in evidence. On the one dated December 31, 1912, there is an item " Cost of plant and franchise—$473,217.82," and on the one dated March 31, 1913,

there is an item "Cost of plant and franchise—$488,754.96." Apparently additions to the plant were being made from time to time. These sheets do not prove the cost of the plant to the predecessor corporation, particularly in the absence of evidence in regard to the additions to the plant, if any, which might be included in these figures. Since the petitioner has not shown us what the correct invested capital for the taxable year in question would be, although it appears by the brief what figures are contended for, the invested capital as determined by the Commissioner can not be disturbed.

The petitioner complains of the failure of the Commissioner to allow a deduction for depreciation of its remaining franchise on the basis of its value on March 1, 1913. In respect to this issue it will be noted that the franchise upon which depreciation was claimed is the newest franchise. This franchise became effective December 31, 1912, to run 25 years and depreciation at the rate of 4 per cent per annum is claimed on a valuation of $200,000, making an annual deduction on this account of $8,000.

The evidence of the value of this franchise is contained in the testimony of the witness Pollock, who was general manager of the petitioner from March 1, 1913, to the present time. The testimony gives the basis for the witness's opinion as to the value and the figure arrived at is $300,000, of which the petitioner is claiming only $200,000. The witness stated that he conducted the negotiations for securing the new franchise starting in the year 1911, and in September 1911, the franchise was secured, to take effect December 31, 1912. He testified that the franchise introduced in evidence was in effect an exclusive franchise for 25 years. In forming his opinion of the value of the franchise he said he considered the earnings of the company for 1912, plus the increase from January 1, 1913, under the new ordinance; the number of consumers on December 31, 1912; the prevailing rates; and the net operating income. While the filtration plants were being installed in 1912, he was commissioned by the Aluminum Company of America, located in the territory served by the water company, to secure additional property to increase their mills, and he spent considerable time in 1912 buying nearby property for them. They acquired in this way 40 acres of first-class river-frontage property for manufacturing purposes. He knew the improvements the Aluminum Company had planned and knew what the prospects for the territory were. He also took into consideration the purchase by the petitioner of the Monessen Water Co. in connection with which transaction it had been necessary for him to go into the details of its earnings, assets and franchises. The Monessen Water Co. had a franchise similar to that of the petitioner. It expired one year and a half after the expiration of the petitioner's

new franchise. The Monessen situation was comparable to that at New Kensington, except that there was not quite so valuable a plant at Monessen. The population of Monessen in 1912 was about 11,000, and the population of New Kensington 13,000. The Kensington Water Co. had about 2,500 consumers and the Monessen Co. had about 1,900. The petitioner paid $475,000 for the Monessen Water Co. In this transaction the physical plant of the Monessen Water Co. was considered to be worth $183,000; the current assets, $38,000; and the franchise, $252,000, the difference between the sum of these two figures and the total amount paid. Since the petitioner's territory at New Kensington was larger, since it had a franchise comparable to that of the Monessen Water Co., and since the number of its consumers was greater, the witness Pollock fixed the value of the New Kensington franchise at $300,000. It is apparent that this witness had had long experience in dealing with water companies, having been an officer of several of such companies for many years. He was familiar with the territory covered by the New Kensington franchise and with the territory covered by the Monessen Water Co., the value of whose franchise he used for comparative purposes. It is our opinion, therefore, that the sum of $200,000 claimed by the petitioner, being considerably less than the figure fixed for the value of the franchises by the witness Pollock, may be accepted for depreciation purposes and depreciation allowed as a deduction at the rate of 4 per cent on the basis of such value.

The remaining issue relates to depreciation on construction and equipment. The petitioner alleges that with the exception of automobiles and meters only 2 per cent depreciation was allowed on plant and equipment, and it contends that it is entitled to 3½ per cent " on the total cost of its plant and equipment." It alleges that the cost of the plant and equipment should include the amount of earned or paid-in surplus of $64,064.48, referred to in the petition. The difficulty with this issue, as in the case of the additional surplus claimed, is that we are unable to state what the Commissioner did. We do not know what rate of depreciation on the plant and equipment he allowed and the allegation as to his allowance of only 2 per cent is denied in the answer. Furthermore, we have no evidence in the record as to the correct amount of depreciation which should be allowed on these assets, nor can we understand why the additional claimed earned or paid-in surplus should be added to plant and equipment for depreciation purposes. We therefore decline to disturb the determination of the Commissioner in computing net income by a further deduction on account of additional depreciation.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*